SCHERRY HARRAH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harrah v. Commissioner
Docket Nos. 4325-75, 9790-76, 3173-81.
United States Tax Court
T.C. Memo 1982-679; 1982 Tax Ct. Memo LEXIS 65; 45 T.C.M. (CCH) 187; T.C.M. (RIA) 82679; November 23, 1982. N. Keith Kellison,Michael C. Draffin, and James E. Merritt, for the petitioner. Eugene H. Ciranni and Chris Zimmermann, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Docket No.
Year
Deficiency
4325-75
1969
$39,063
1970
92,677
1971
82,120
9790-76
1974
53,506
3173-81
1972
69,999
1973
58,550
1975
63,059
1976
48,557
The disputed issues arise out of the divorce *66 of petitioner Scherry Harrah and William Harrah on March 3, 1969. By order of this Court dated February 8, 1977, this case was bifurcated for trial, and the opinion of the first part is reported at . After concessions, the remaining issue is whether annual payments of $90,000 received by petitioner pursuant to a settlement agreement are taxable to her as alimony under section 71. [1]
FINDINGS OF FACT Most of the facts are stated in detail in the prior report of this Court at Those facts are incorporated herein by this reference. Other facts are stipulated and found accordingly. We will restate the facts only insofar as pertinent to the issue before us. Petitioner, Scherry Harrah, was a resident of Reno, Nev., on the dates each of the petitions herein was filed. Petitioner *67 and William "Bill" Harrah (hereafter William) were first married in 1948. In 1952 they divorced only to be remarried again in 1954. [2] Their second marriage lasted until March 3, 1969, when they were divorced for the second and final time. Prior to the entry of the divorce decree on March 3, 1969, petitioner and William entered into a property settlement agreement (the Agreement) which was approved by the divorce court. The Agreement governs the distribution of considerable wealth accumulated both before the during the parties' marriage. William was the founder and driving force behind the success of Harrah's Club--the well-known gambling, hotel, food, and bar establishment begun in Reno, Nev.[3] The Agreement is the result of intense and protracted negotiations between highly competent attorneys and accountants representing both parties to the divorce.It is a clear and concise document which embodies the complete understanding of both parties. *68 Paragraph 4 of the Agreement governs the division of community property. Paragraph 5 covers the subject of petitioner's separate property, and paragraph 6 covers William's separate property. Paragraph 12 requires William to pay petitioner "* * * for her support and maintenance as alimony the sum of $90,000 per year." These payments were secured and were to continue for a period of 11 years. Even if petitioner and William remarried or if William died, the payments were to continue for the 11-year period. Beginning 1969, petitioner received payments of $90,000 per year as provided by the Agreement. [4] On her 1969 through 1976 Federal income tax returns, petitioner reported as alimony income the $90,000 received in each of those years. On January 10, 1978, petitioner filed claims for refund for her taxable years 1975 and 1976, claiming the payments were erroneously reported as alimony and should have been treated as non-taxable property settlement payments. Those claims were denied. [5]
*69 OPINION The sole issue is whether petitioner must include the yearly $90,000 payments in her gross income. Petitioner contends she recieved the payments as the result of a non-taxable exchange of community property. Respondent contends the payments were alimony and, thus, are includable in petitioner's gross income under section 71. We agree with respondent. Section 71(a) provides that if a wife is divorced or legally separated from her husband she must include in her gross income periodic payments received by her in discharge of a legal obligation which, because of the marital relationship, was imposed on her husband by the separation agreement or divorce decree. Where, however, a husband makes payments in satisfaction of the property rights of his wife, the amounts received by his wife are capital in nature and are not includable in her gross income under section 71. , affg. ; , affg. a Memorandum Opinion of this Court. Whether such payments are part of a property settlement or whether they constitute *70 alimony is a question of fact, ; and the dominant factor is the intent of the parties. ;. We find the evidence overwhelming that the parties intended the payments at issue herein to be alimony. Both parties to the divorce were represented by competent attorneys and accountants, and at stake was a considerable amount of wealth accumulated during the years. The Agreement that was finally reached was the result of intense and protracted negotiations, and, in the end, petitioner was to receive "* * * for her support and maintenance as alimony the sum of $90,000 per year." Although we are not bound by the lebel given to the payments, , affd. , there is little doubt the parties meant the payments to be "alimony." Petitioner's main contention is that she received the payments in exchange for a portion of her community property interest in Harrah's Club. Through various negotiation proposals, net *71 worth statements, and emphasizing her own efforts which contributed to the Club' success, petitioner attempted to show that, absent the $90,000 yearly payments at issue herein, she received less than her fair share of community property. [6] Thus, she concludes the $90,000 payments, in substance, are in exchange for her larger share of community property. However, petitioner's proof is inconclusive; it is largely a valuation argument struck with many imponderables. As this Court stated in the prior opinion of this case: Since there were so many indeterminate factors that would have to be given consideration in making an equitable apportionment of the appreciation in value of William's assets between his separate property and the community property, we believe [the Nevada Supreme Court] would have recognized that the best way to determine a fair and equitable apportionment would be to approve the noncollusive *72 private settlement negotiated between the parties whose interests were antagonistic and who were aware of all the relevant facts. To do otherwise in this case would be asking for an almost insurmountable task * * *. [.] We, likewise, are unwilling to find petitioner's interest in the community property was greater than what she received under the Agreement. The arm's-length bargaining position of the two parties results in a far more accurate measure of their respective community property interests. [7]
Petitioner points to several factors which she claims establish that these payments are in exchange for her property interests. Those factors are (1) the presence of a fixed sum, (2) the payments are *73 not related to the husband's income, (3) the payments continue whether the parties subsequently remarry or whether William dies, (4) the payments are secured, and (5) petitioner received a considerable amount of other property which lessened her need for alimony. While these factors weigh in favor of petitioner, they do not convince us the payments, in substance, were anything other than alimony. Consistent with the clear intent of both parties, these payments were alimony. Accordingly, petitioner must include them in her gross income under section 71. To reflect concessions and the prior holding of this Court, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. Except for the prior opinion of this Court, , these cases are consolidated for purposes of trial, briefing, and opinion.↩
2. During the period of their first divorce, petitioner and William continued to live together, and William continued to support petitioner.↩
3. William incorporated Harrah's Club in 1952. Also incorporated in 1952 were Harrah's Land Development Company and Harrah's Bingo Club, both of which were in the business of leasing real estate, the principal tenant of which was Harrah's Club. In 1958, Harrah's Land Development Company was merged into Harrah's Bingo Club which was renamed Harrah Realty. Harrah South Shore, a service corporation, was incorporated in 1959. In 1971, a holding company called Harrah's was formed and all the stock of Harrah's Club, Harrah Realty, and Harrah South Shore was transferred to it. Harrah's then made a public offering of its stock and, based on the offering price, the fair market value of Harrah's was approximately $55,000,000 as of October 27, 1971. In February 1980, Harrah's stock sold for a total consideration of approximately $55,000,000.↩
4. As required by the Agreement, William's estate continued to make the $90,000 payments to petitioner after he died in 1978. ↩
5. Once a notice of deficiency is mailed and the taxpayer files a petition, this Court retains jurisdiction to determine the amount of an overpayment of tax if it finds there is no deficiency. See sec. 6512(b).↩
6. In negotiations, petitioner initially claimed her share of community property was $11,500,000 while William claimed her share was $115,000. In the end, petitioner received over $3,300,000 for her share of community property (excluding the payments at issue herein).↩
7. In the prior opinion of this case, ,↩ this Court held that since petitioner received stock as part of a division of community property, she took a carryover community basis in the stock. In so holding, this Court found the Agreement binding for purposes of determining whether the stock petitioner received was community or separate property under state law.